# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

FERNANDO DeLEON, *et al.*,  )
     Plaintiffs,  )
                          )     **Civil Action No. 08-00562-KD-N**
v.  )
                          )
**ST MOBILE AEROSPACE**  )
**ENGINEERING, INC.,**  )
     Defendant.  )

## ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (Docs. 38, 39), Plaintiffs' response in opposition (Docs. 41, 42) and Defendant's reply thereto (Doc. 43).

**I.**    **Complaint**

Plaintiffs initiated this litigation on September 29, 2008, alleging discrimination on the basis of race and national origin pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981.1 (Doc. 1). Plaintiffs allege five counts against ST Mobile Aerospace Engineering, Inc. ("MAE"): Title VII disparate treatment-race (count one); Title VII disparate treatment-national origin (count two); Title VII retaliation (count three); Section 1981 disparate treatment (count four); and Section 1981 retaliation (count five). (Id.) Specifically, Plaintiffs Fernando DeLeon, Jose Castillo, Jesus Nunez, Alain Ramirez-Flores ("Ramirez"), Peter Loo and Wilmer Crespo2 allege that they are Hispanic males who worked for MAE as contract mechanics on crew leader John Shaw's ("Shaw") crew from October 2005 through April 3,

---

1 Plaintiffs previously filed identical EEOC charges on their Title VII claims and each received a Dismissal and Notice of Rights which concluded that "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statute." (Doc. 1).

2 DeLeon and Nunez are Mexican (Doc. 38-1 (Dep. DeLeon at 14, 133); Doc. 38-3 (Dep. Nunez I at 12); Doc. 38-4 (Dep. Nunez II at 53)); Castillo and Ramirez are Cuban (Doc. 38-2 (Dep. Castillo at 14, 145); Doc. 38-5 (Dep. Ramirez at 19-20, 148)); Loo is Peruvian (Doc. 38-6 (Dep. Loo at 13)); and Crespo is Venezuelan (Doc. 38-24 (Dep. Crespo at 13)). All identify their race as "Hispanic." (Id.)

2006; Shaw harassed them because of their national origin and race; and MAE terminated their assignments on April 3, 2006 in retaliation for their complaint about the harassment <u>and</u> because of their national origin and race. Plaintiffs assert that Shaw engaged in a pattern of harassment against them (but not to other non-Hispanic white employees) by rushing them at work and consistently accusing them of being behind schedule when they were not; throwing work cards at them; snapping his fingers at them and demanding they work faster; hurrying them up by shouting "Andale, Andale!" or "chop chop" at them; and making then perform menial tasks that were not required of non-Hispanics. (Doc. 1 at 4-5).

## II.    <u>Facts</u>[3]

### A.    <u>Structure of MAE</u>

MAE performs commercial aircraft maintenance and repair for various commercial airlines. The work is performed by aircraft mechanics with various specialties including A&P Mechanics (airframe and power plant or APG), Sheet-metal/Structures Mechanics, Avionics Mechanics and Interiors Mechanics. (Doc. 39 at 5). Plaintiffs were Interiors Mechanics who generally inspect and repair panels, seats, overhead luggage departments, carpet, lavatories and galleys inside the aircraft.

MAE's aircraft mechanics have progressive skill levels ranging from Skill Level I (least) to Skill Level III (most) to Apprentice (training position). All contract mechanics are generally required to be Skill Level III or Senior Mechanics. (Doc. 38-12 (Decltn Wellington at ¶3 and Exs. 1A-1E)). MAE's aircraft mechanics include MAE employees and temporary contract mechanics, and based on workloads, MAE may release contract mechanics at any time including on any given day, for lack of work. (Doc. 38-12 (Decltn. Wellington at ¶2); Doc. 38-3 (Dep. Nunez I at 89); Doc. 38-1 (Dep. DeLeon at 116-117); Doc. 38-15 (Decltn. Caceres at ¶6)).

Throughout the years, MAE's mechanics in all specialties (employees and contract workers) have performed work in other specialties depending on the workload and availability of mechanics within a

---

3   The facts have been construed in a light most favorable to the plaintiffs. Defendants asserted facts that have not been challenged by admissible evidence have been accepted as fact for purposes of this summary judgment order.

specific specialty. Notably, the job descriptions for each of the mechanic specialties states that the "essential responsibilities" include to "perform any duties that may be assigned by his or her supervisor." (Doc. 38-12 (Decltn. Wellington at ¶3 and Exs. 1A-1E)).. According to MAE, primarily due to a shortage of A&P and Structures Mechanics over the years, Interiors Mechanics (such as Plaintiffs) have often been assigned to perform less skilled A&P and Structures work, including opening and closing the exterior panels of the aircraft, lubricating the aircraft, changing the landing gear and performing other corrosion maintenance. (Id.; Doc. 38-13 (Decltn. Langley at ¶3); Doc. 39 at 6-7; Doc. 38-14 (Decltn. Shaw at ¶9-10); Doc. 38-3 (Dep. Nunez I at 23-24)). While much of the work performed by A&P Mechanics is more highly-skilled and may entail more responsibility than the work performed by Interiors Mechanics, the work is not more physically demanding or difficult to perform than Interiors Mechanics work. (Id.; Doc. 38-10 (Dep. Langley at 39-40); Doc. 38-17 (Decltn. Glover at ¶3)).

MAE's aircraft mechanics are generally assigned to work on aircraft projects in a particular customer's aircraft program (e.g., Northwest Airlines program). During the time relevant to this litigation, MAE was performing work on several different programs in eight expansive aircraft hangers with from one to three aircraft projects in progress in each hangar. (Doc. 38-12 (Decltn. Wellington at ¶4)). Mechanics are assigned to crews comprised of 10-15 mechanics in the same specialty under the direction of a "Lead." (Id.; Doc. 38-13 (Decltn. Langley at ¶4)). Interiors Leads on a particular customer aircraft program report to the Interiors Supervisor for that program who then reports to the Program Manager. (Doc. 38-13 (Decltn. Langley at ¶5)). The Lead generally assigns jobs to each crew member at the beginning of each shift by distributing work or job assignment cards to each member of the crew and is responsible for directing, monitoring and checking the crew's work throughout the shift. (Id. at ¶4). The Lead has no authority to terminate an employee or release a contract worker. (Id.; Doc. 38-14 (Decltn. Shaw at ¶1)). For a Lead to send a contract worker home for lack of work on a given day, the

Lead must have the approval of the Interiors Supervisor.  (Id.)  The Program Manager must approve the discipline, release or termination of a contract worker.  (Id.)

Lead John Shaw ("Shaw") has worked at MAE for over 16 years as an Interiors Mechanic, an Interiors Lead and acting Interiors Supervisor.  (Doc. 38-14 (Decltn. Shaw at ¶1).  Shaw (Caucasian) was working as an Interiors Lead on the Northwest Airlines program in Hangar 1 on September 25, 2005. (Id.)

**B**.       **EEO Policy**

MAE has a comprehensive EEO Policy that covers employees and contract workers and which prohibits discrimination and harassment because of race and national origin.  (Doc. 38-12 (Decltn. Wellington at ¶9)).  Each employee and contract worker receives a copy of the EEO policy during new hire orientation and is required to sign an acknowledgment to confirm that he or she has read, understands and agrees to comply with same.  (Id. at ¶9(c)).  Additionally, the EEO policy is included in the MAE Employee Handbook and each employee signs an acknowledgment to confirm he or she has read and will abide by the policy. (Id.)  Moreover, the EEO policy is also posted on 10 communication centers located throughout MAE's facilities including in each aircraft hangar where mechanics work and in the cafeteria/break room. (Id. at ¶9(d) and Ex. 4-3)).  Further, MAE periodically includes articles on the EEO policy in the employee newsletter Plane Talk.  (Id. at ¶9(d)).  Finally, MAE established a multi-racial EEO Council to promote full implementation of the EEO Policy and upon request, to assist any employee or contract worker in presenting a complaint under same to the Manager of Human Resources. (Id.)

Each plaintiff also received, read (except for Nunez),[4] and signed a copy of MAE's EEO policy.

---

4 During Nunez's multiple assignments at MAE since 1997, he received a copy of the policy five times and each time signed the policy under the caption which states "I have read, understand and agree to comply with this EEO/Harassment Policy[;]" however, Nunez testified that he never read the policy. (Doc. 38-3 (Dep. Nunez I at 152-154).

(Doc. 38-1 (Dep. DeLeon at 77-78); Doc. 38-2 (Dep. Castillo at 152-153); Doc. 38-12 (Decltn. Wellington at ¶5 and Ex. 2); Doc. 38-5 (Dep. Ramirez at 94-97); Doc. 38-6 (Dep. Loo at 79-81); Doc. 38-24 (Dep. Crespo at 79-82)).  All of MAE's managers, supervisors and Leads also receive comprehensive training on the EEO policy and their role in the enforcement of same during initial orientation and periodically thereafter.  Specifically, Lead John Shaw, Interiors Supervisor Gary Langley and Program Manager Curtis Bryant each received and signed the EEO Policy and the Handbook acknowledgment and also received comprehensive training on the policy.  (Doc. 38-12 (Decltn. Wellington at ¶9(d)-(e) and Ex. 4-2); Doc. 38-9 (Dep. Bryant at 30-34); Doc. 38-11 (Dep. Shaw at 23-24); Doc. 38-13 (Decltn. Langley at ¶1); Doc. 38-14 (Decltn. Shaw at ¶2)).

The EEO Policy includes a Complaint Procedure that requires any employee or contract worker who believes that he or she has been subjected to discrimination or harassment because of race or national origin to report the complaint directly to the HR Manager (Richard Wellington).  (Doc. 38-12 (Decltn. Wellington at ¶9(a) and Ex. 4-1)).  The MAE EEO Policy Complaint Procedure provides that:

> You must promptly report any incident of harassment or any other violation of our EEO/Harassment Policy directly to our Manager, Human Resources. You are encouraged to report any harassment or violation of our Policy to your manager or supervisor, who has a responsibility to prevent harassment and stop it if it occurs. However, to ensure that MAE can promptly investigate and, if appropriate, take prompt and effective action, it is essential that you promptly notify our Manager, [of] Human Resources. Simply reporting it to your manager or supervisor is not sufficient.

(Id. at Ex. 4-1).  As HR Manager, Dick Wellington has investigated complaints under the policy and has counseled and disciplined employees for violating the policy including verbal and written warnings, suspensions without pay, demotions (or a combination of same), and discharge.  (Id. at ¶9(f)).

### C. **Plaintiffs**

In September 2005, Plaintiffs were retained to work at MAE as contract workers (Interior

Mechanics) through various contracting companies.5  Some Plaintiffs had previously worked as contract

Interiors Mechanic workers at MAE before being assigned to John Shaw's crew in October 2005 (*e.g.*,

DeLeon and Nunez had worked at MAE periodically since the late 1990s).  (Doc. 38-1 (Dep. DeLeon at

54-56); Doc. 38-3 (Dep. Nunez I at 21, 29-30, 89)).  All the Plaintiffs, except for Nunez, admit that

before being assigned to Shaw's crew in October 2005, they had no complaints about their treatment at

MAE and were treated fairly.  (Doc. 38-1 (Dep. DeLeon at 54); Doc. 38-2 (Dep. Castillo at 55-56); Doc.

38-3 (Dep. Nunez I at 29, 34); Doc. 38-5 (Dep. Ramirez at 82-83); Doc. 38-6 (Dep. Loo at 77-78); Doc.

38-24 (Dep. Crespo at 78-79)).  Also in October 2005, contract Interiors Mechanics workers Torin

Glover (African American) and Carla Caceres (Hispanic) were assigned as members of Shaw's crew, and

MAE employee Interiors Mechanic Jennifer Davis was assigned as the Relief Lead.  (Doc. 38-14 (Decltn.

Shaw at ¶4)).  One Caucasian American was later assigned to the crew, MAE employee and Apprentice

Scott Bush (who was reassigned from the Materials Department to work as an Apprentice Interiors

Mechanic).  (Id. at ¶5).  Thus, Shaw's crew consisted of the six plaintiffs (Hispanic), Glover (African-

American), Caceres (Hispanic), Bush (Caucasian) and Davis (African-American).

    D.    **The Work**

        At any given time at MAE, there were from one to three aircraft projects in progress on the

Northwest Airlines program with a team of mechanic crews assigned to each aircraft for the day-shift

(5:00 a.m.-3:30 p.m.) and one additional team assigned to the evening shift (3:30 p.m.-midnight).  These

crews performed "L" or "Light" checks and maintenance on the aircraft with a seven to eight day

---

5 Contract coordinators work for a contracting company which supplies temporary contract workers to businesses
such as MAE (workers who are not MAE employees), to supplement the workforce to meet increased workload
demands with temporary contract mechanics.  (Doc. 38-12 (Decltn. Wellington at ¶2).  The contract coordinator is
the point of contact for that company's contract mechanics and MAE's HR Department is the contact for the contract
coordinators.  (Id.)  Nunez and DeLeon were employed by AeroJet Support with Valdir Damota as their contract
coordinator; Castillo and Ramirez were employed by Air Maintenance Technology with Jim Castellano as their
contract coordinator; and Loo and Crespo were employed by Aircraft Maintenance and Engineering with Daniel
Hardin as their contract coordinator.  (Id.)  See also Doc. 38-18 (Decltn. Hardin at ¶1-4)).

turnaround time for completion of each aircraft. Supervisors for the various mechanic specialties (A&P, Structures, Interiors, etc.) and the Program Manager scheduled the mechanics' work to ensure completion of all work within this time-frame.

Curtis Bryant ("Bryant") became Program Manager in early December 2005. At that time, Bryant directed the Interiors Leads (including Lead Shaw) on all four crews to *expedite* the Interiors work and assign the Interiors Mechanics to perform routine A&P work as part of the regular schedule for completion of each aircraft. (Doc. 38-14 (Decltn. Shaw at ¶11, 20); Doc. 38-13 (Decltn. Langley at ¶9); Doc. 38-17 Decltn. Glover at ¶11)). Lead Shaw directed his entire crew to open the exterior panels of the aircraft as one of their first jobs (something that is typically A&P work) which enabled the A&P Mechanics to perform more highly skilled work on the power plant beneath the panels, and to reinstall the panels when the A&P Mechanics completed the work. (Id.; Doc. 38-9 (Dep. Bryant at 46-47, 60-62)). Interiors Mechanics were also regularly assigned such jobs as lubricating the aircraft, performing preventative corrosion maintenance, changing and greasing the landing gear and clean-up work. (Id.) See also (Doc. 38-10 (Dep. Langley at 33-36); Doc. 38-13 (Decltn. Langley at ¶3, 9, 10); Doc. 38-17 (Decltn. Glover at ¶11-12)),

Sometime later, Northwest Airlines directed MAE to *reduce Interiors work to a minimum* by performing routine inspections and only Light maintenance that could not be postponed. (Doc. 38-14 (Decltn. Shaw at ¶10-12, 20); Doc. 38-13 (Decltn. Langley at ¶3, 9); Doc. 38-17 (Decltn. Glover at ¶11)). To comply with this directive, Bryant instructed all Interiors Leads – including Shaw -- to scale back Interiors work from seven to eight days to three to four days, which freed-up the Interiors Mechanics to then perform A&P/Structures (and other) work. (Id.) Some of the plaintiffs complained about any job assignment that was not Interiors work. Each plaintiff states, however, that he always performed the A&P and Structures work satisfactorily and that he was never faulted for his job performance. (Doc. 38-

1 (DeLeon at 74, 108, 112-113); Doc. 38-2 (Dep. Castillo at 75, 81-82, 90, 98-99); Doc. 38-4 (Dep. Nunez II at 39-41); Doc. 38-5 (Dep. Ramirez at 88-89, 137); Doc. 38-6 (Dep. Loo at 91-92, 117-119); Doc. 38-24 (Dep. Crespo at 69, 128-129, 137-139)).

### E. The alleged harassment

To expedite the Interiors work Shaw routinely told his entire crew to "hurry up" and used the Spanish term "Andale" (meaning hurry). Plaintiffs allege that Shaw's offensive conduct consists of the manner in which he rushed the crew to complete the Interiors work so he could assign them to perform A&P and Structures work and also Shaw's assignment of the clean-up work to the Plaintiffs. Specifically, it was offensive to the plaintiffs when Shaw told them they were behind schedule, snapped his fingers and told them to "hurry up, Andale (hurry) and chop chop," checked on the progress of the work multiple times per day, looked over the crew's shoulders and stared at them while they worked and that he tossed or threw work assignment cards to crew members (versus handing them to them). (Doc. 38-1 (Dep. DeLeon at 108-109, 133-145, 171-172, 177-180); Doc. 38-2 (Dep. Castillo at 108-116, 127); Doc. 38-3 (Dep. Nunez II at 54-69, 228); Doc. 38-5 (Dep. Ramirez at 149-159, 169-171, 174-176, 183, 187); Doc. 38-6 (Dep. Loo at 141-144, 146-152, 159); Doc. 38-24 (Dep. Crespo at 125-126, 155-162, 169-177)).[6]

Plaintiffs argue generally that the rude behavior/harassment by Shaw was directed to the Hispanic employees. However, DeLeon testified that all Interiors, except for Scott Bush (Caucasian), performed A&P work. (Doc. 38-1 (Dep. DeLeon at 109-112, 142-145)). DeLeon also stated that Shaw admonished the entire crew by telling them to "hurry up, hurry up" and "get it done" by snapping his fingers and saying "Andale, Andale, chop chop" and would throw work cards instead of handing them directly to

---

[6] Crew members Glover, Davis and Caceres admit that Shaw regularly rushed the entire crew to complete the work but deny that any person was singled-out and deny that he harassed the crew in any way. (Doc. 38-17 (Decltn. Glover at ¶10-11, 15-16, 18-20, 24, 26, 28); Doc. 38-16 (Decltn. J.Davis at ¶4, 5, 10-12); Doc. 38-15 (Decltn. Caceres at ¶7-10)).

crew members. (Id. at 108-109, 111-112, 133-145, 172, 177-180, 204). DeLeon testified that all mechanics crews were sweeping and cleaning outside the aircraft for a period of time, but complains that Shaw's crew, including Bush, had to perform cleaning work for a longer period of time. (Id. at 145, 156-163, 168-169, 260).

DeLeon testified that twice when he was laying down in the aircraft to perform work, Shaw said "Oh, man, you Mexicans always laying down[]"-- the second time DeLeon said "Hey, you think that's funny." (Id. at 169-170). Shaw never said it again. (Id. at 170). DeLeon testified that he complained two-three times to Shaw about performing the A&P work and Shaw told him to take it to the Supervisor Langley, which he did.[7] (Id. at 120-122). DeLeon testified that he talked to Langley, to complain about the A&P work and Langley told him he was one of his best mechanics doing the work and was not going to let anybody else do it because "I know you guys can do it." (Id. at 122-125).

Castillo testified all crew members performed A&P work even though they were Interiors Mechanics. (Doc. 38-2 (Dep. Castillo at 75)). "All of us were doing this type of[]" "dirty work" and sweeping/cleaning. (Id. at 78-82, 86, 89-91, 127)).[8] Castillo testified that every day Shaw had the crew sweep and clean the hanger, snapped his fingers and told the crew to "rush, rush" or "chop chop" and "Andale, Andale," and that he objected to being told to hurry up regardless of whether Shaw used those specific terms. (Id. at 108-112, 127). Castillo testified that Shaw distributed work assignment cards by "almost throwing the papers" or put the cards between his two fingers and handed them to Castillo "sideways" without directly looking at him. (Id. at 113-116). Castillo testified that once, he took his

---

7  A week before termination, DeLeon and Glover told Langley about the way Shaw was treating them, telling them to "chop, chop" and hurry up and "get[ting] your paperwork thrown at you." (Id. at 122, 125-126, 176-177). DeLeon mentioned Shaw's comments "I got my Mexicans doing it. They'll go ahead and finish it. …not only could you speak Spanish, you're Mexican . . . " (Id. at 126). Langley told him "we'll fix the problem." (Id. at l77).

8  Plaintiffs cite Castillo's deposition at page 210 to support their assertion that non –Hispanic employees were not required to sweep the hangar. This mischaracterizes the testimony which actually states that when Shaw would hand gesture for the workers to sweep that he would be looking "to the Latinos, to our group." Previous testimony from

resume to Shaw and said that he was an interiors mechanic so why did he have to do the cleaning; Shaw told him "I am the boss and you do what I tell you to do[] otherwise, you would be fired[.]" (Id. at 119).

Nunez testified that he did not like the A&P work that "everyone" was assigned to perform though and believed he should not have had to perform it. (Doc. 38-3 (Dep. Nunez I at 24, 30-37); Doc. 38-4 (Dep. Nunez II at 39-43)). Nunez testified that he was pushed to finish Interiors work so he could be assigned to A&P work which he found stressful, and that every day Shaw harassed "the team" (plaintiffs and Glover, Davis and Carceres) when he snapped his fingers at the crew, would throw papers, push him to finish work on time, and told them to "hurry up, chop chop and push, push" and "Andale" – and that he would say it as soon as 20 minutes after the day started. (Doc. 38-3 (Dep. Nunez I at 29-36, 201-206); Doc. 38-4 (Dep. Nunez II at 22, 39-43, 54-69, 228)). Nunez testified that every day, when Shaw assigned him a particular job, he told him it was "[f]or the Mexican." (Doc. 38-4 (Dep. Nunez II at 55, 58-60)). Nunez testified that Shaw said "[t]hat is the reason that the Mexicans are here so they can make the work for us[]" which he interpreted to mean that if you are a Mexican you have to work harder like a donkey. (Doc. 38-3 (Nunez I at 204)). Nunez testified that everyday Shaw stated that he did not like Mexicans and called Nunez "a beaner or something" all the time. (Doc. 38-4 (Dep. Nunez II at 221-222).

Ramirez testified that Shaw assigned cleaning jobs, tossed work assignment cards to him instead of handing them out directly, and "rushed" the team – meaning "the whole crew"(except relief lead Jennifer Davis who was "somewhere else') -- to complete work by snapping fingers at them and saying to all of them "Andale" and "chop chop" daily. (Doc. 38-5 (Dep. Ramirez at 149-150, 152-159, 162-164, 170-171, 173-176, 183, 186)). Because he is Cuban, Ramirez objected to the word "Andale" and believes the word is a Mexican word and is "ugly." (Id. at 153-155). He testified that the word is

---

Castillo, as cited, indicated that the entire crew was required to sweep.

offensive because he was not Mexican; "Andale. I mean, it's like to a dog, animal." (Id. at 159).
Ramirez stated that Shaw "the way he treat us, he treat us like a dog." (Id.) He also objected to use of
the term "chop chop" but testified that "lots of places tell you that." (Id. at 156-159). He testified that
Shaw assigned him to complete a particular clean-up job once and told him he would be sent home if he
did not complete the job – Ramirez completed the job and was not sent home. (Id. at 162-163). Ramirez
testified that Shaw at times laughed at the crew when they performed clean-up work and commented to
other leads "you see how I got these Latinos, you know, cleaning." (Id. at 171). Ramirez testified that
Shaw would ignore his questions and would laugh at him and say "what do you say?" when he talked to
Shaw in English, and that Shaw threatened him (that if he did not do a particular job, he would let him
go). (Id. at 186-187, 263-264).

Loo testified that he and other crew members were also assigned A&P work, he was capable of
performing same and did so satisfactorily and was not criticized or faulted for his work. (Doc. 38-6
(Dep. Loo at 51, 62-63, 91-92, 117-123)). However, Loo testified that Shaw harassed the crew by
having them clean/sweep, pressuring and "pushing us into finalizing the work" by snapping his fingers
and saying "Andale, Andale" and "time, time" while pointing to his watch, as well as by constantly
watching the crew while they worked and following them to the warehouse when they picked up parts to
see how long it took them to do so. (Id. at 141-144, 146-152). Loo stated that he believed that Shaw
"was harassing only the Hispanics[]" because even though he directed his comments and actions to the
entire crew, "[i]f somebody says andale, andale . . . to somebody, an Hispanic will understand but the
Americans will not." (Id. at 149-150). Loo also testified that Shaw threw or tossed work assignment
cards instead of handing them directly to him. (Id. at 146-147). Loo related that once, when other crew
members were assigned to perform an A&P "slides" job, Shaw said in front of Castillo, Ramirez, Nunez,
Crespo and Loo that "Hispanics were not people prepared for hard work." (Id. at 154). Loo testified that

"[t]he harassment was based on the pressure that he would put on us even when we're doing the work in a good manner and satisfactory. But he would pressure us to finalize the work before." (Id. at 159).

Crespo testified that all members of the crew were assigned to perform A&P work and that he performed quality work and was never faulted or criticized for his job performance. (Doc. 38-24 (Dep. Crespo at 69, 106-107, 128-129, 134, 137-139)). However, Crespo testified that Shaw harassed "our team" (meaning the plaintiffs, Carceres and Glover) (except relief lead Davis) by regularly rushing them to complete their work by snapping his fingers and saying "chop chop" every day and saying "Andale" (3-4 times), by standing behind the crew with a facial expression like "a bull" ("he would handle us like a bull[,]"), by inspecting their work 10 times per shift, and by throwing work assignment cards to crew members. (Id. at 126, 156-162, 171-177). Crespo testified that for one job (applying corrosion prevention compound), he refused to perform the work because he did not feel well and was allowed to go home that day, but that another time when instructed to perform that job, Shaw said "the [APG] don't like to do that…give the job to the Hispanic." (Id. at 138-139, 170). Crespo stated also, that once when he and Castillo were inspecting and replacing an emergency slide on an aircraft, Shaw made them redo the work and said "You Latinos always do that." (Id. at 162, 169).

Non-party Torin Glover testified that the entire crew was assigned to perform A&P and Structures jobs and they all performed the same clean-up jobs as well, but that Shaw did push the entire crew to expedite Interiors work so they could be assigned A&P work and told "everyone on the crew" to "hurry up," "tighten-up" and "Andale." (Doc. 38-17 (Decltn. Glover at ¶11, 15, 18, 19, 21)). Glover testified that he was rushed to complete Interiors work to enable him to assist A&P Mechanics only to have them "pick" their jobs leaving the less desirable ones for DeLeon and him to perform and at times, laughing at them. (Id. at ¶15, 24). Glover testified that when he went with plaintiffs to HR Manager Wellington on April 3, 2006, he considered his complaint about the A&P Mechanics to only be "job

related, not racial." (Id. at ¶26-28).

Non-party Jennifer Davis (African-American), Shaw's relief Lead, performed the same jobs as all other crew members when not acting as Lead in Shaw's absence, including A&P/Structures work and clean-up work. (Doc. 38-16 (Decltn. Davis at ¶1, 3, 6-8)). Davis testified that at the direction of the Program Manager and Interiors Supervisor, Shaw was under pressure to finish Interiors work on the aircraft quickly, particularly after the time for completing Interiors work was reduced to three days. (Id. at ¶6-8, 10). Davis testified that when the crew was working together inside the aircraft, Shaw often told the entire crew to "hurry-up" and sometimes said 'Andale' – and she even told the crew to "hurry up" at times, but she never heard Shaw make any kind of racial comment and "said these things to the entire crew[.]" (Id. at ¶4, 10, 11).

Non-party Carla Caceres (Hispanic) testified that she worked on Shaw's crew the entire time that Plaintiffs did and that she and all other members of the crew were assigned to perform Interiors and Structures work. (Doc. 38-15 (Decltn. Caceres at ¶1-2, 6)). Carceres testified that it was not unusual for Interiors Mechanics to be assigned to perform A&P or Structures work if Interiors was slow or if A&P or Structures crews needed help and to clean-up inside the aircraft and around the aircraft. (Id. at ¶6, 11). Caceres testified that she heard Shaw tell the crew to hurry up and may have said "Andale" and snapped his fingers. (Id. at ¶8).

###    F.    The Complaint

On Thursday March 30 or Friday March 31 of 2006, DeLeon and Glover were assigned to work one of the more highly skilled A&P jobs (inspecting/replacing the emergency escape slide above the aircraft's wing). Shaw described this as a "pacing" item on the aircraft and any delay in completion of the job would delay the overall completion of the aircraft which was scheduled to leave that evening. Shaw inspected DeLeon and Glover's progress several times and told them to hurry as they were holding

up the aircraft's completion. DeLeon and Glover became irritated with the repeated inspections and instructions and upon completion left the hangar for 1-1.5 hours. Upon their return, Shaw confronted them about their absence; each gave an excuse and complained to Shaw about rushing them to complete the job and DeLeon testified that Shaw told them "you need to go talk to the supervisor [Langley]." (Doc. 38-1 (Dep. DeLeon at 120-121); Doc. 38-17 (Decltn. Glover at ¶23); Doc. 38-14 (Decltn. Shaw at ¶16)).

Glover and DeLeon approached Supervisor Langley and complained to him about the amount of A&P work they were required to perform as well as about Shaw rushing them to complete work and about the A&P Mechanics "picking" their jobs and "laughing at them while they worked." (Doc. 38-10 (Dep. Langley at 60-68); Doc. 38-17 (Decltn. Glover at ¶24)). Langley explained to them that they were assigned more A&P work and more highly-skilled A&P work because they were the most capable mechanics on Shaw's crew – "my best guys doing the work. I'm not going to put . . .anybody else to do it, because I know you guys can do it." (Doc. 38-1 (Dep. DeLeon at 122-127); Doc. 38-10 (Dep. Langley at 65-67)). Langley told them that he would look into their complaints about the A&P Mechanics and also talk to Shaw about rushing their work. (Doc. 38-10 (Dep. Langley at 60-68); Doc. 38-17 (Decltn. Glover at ¶24); Doc. 38-1 (Dep. DeLeon at 121)).[9] Langley testified that he received their complaint on March 30/31 and was off Saturday and Sunday and that Shaw was not scheduled to work again until the afternoon of April 3, 2006. (Doc. 38-10 (Dep. Langley at 71-74)). Thus, he had not had an opportunity to look into the complaint before April 3, 2006. (Id.)

On April 3, 2006,[10] at about 1:15 p.m., the Plaintiffs (Hispanic) and co-worker Glover (African

---

[9] Nunez testified that he also talked with Langley 3-4 weeks before the April 3, 2006 meeting to see if he could fix things "and he not do anything. It's still the same." (Doc. 38-4 (Dep. Nunez II at 88)). Langley testified that Nunez never came to him with a complaint. (Doc. 38-10 (Dep. Langley at 61)).

[10] Before the meeting, neither HR Manager Wellington nor Program Manager Bryant had any knowledge of any of the workers' complaints about Shaw. (Doc. 38-12 (Decltn. Wellington at ¶10 and Ex. 5); Doc. 38-8 (Dep.

American) went to HR Manager Wellington to register a complaint against Shaw. (Doc. 38-12 (Decltn. Wellington at ¶10 and Ex. 5); Doc. 38-1 (Dep. DeLeon at 78-79, 193-194); Doc. 38-2 (Dep. Castillo at 106); Doc. 38-4 (Dep. Nunez II at 165-167, 173); Doc. 38-5 (Dep. Ramirez at 97-98, 227-230, 234-235); Doc. 38-6 (Dep. Loo at 80-81, 178-180, 182-183, 185-187); Doc. 38-24 (Dep. Crespo at 82-83, 209-210, 214-216); Doc. 38-8 (Dep. Wellington at 16)). DeLeon and Glover spoke because "they spoke English better." (Doc. 38-1 (Dep. DeLeon at 193-197)). The other plaintiffs spoke in Spanish to DeLeon. (Id.)

HR Manager Wellington immediately called in Program Manager Curtis Bryant and Interiors Supervisor Gary Langley on the meeting, because they were familiar with the crew's job assignments, and the complaints about Shaw were repeated. (Doc. 38-8 (Dep. Wellington at 10-17, 28, 31-32); Doc. 38-9 (Dep. Bryant at 44-47); Doc. 38-10 (Dep. Langley at 93-97, 101-103)). DeLeon and Glover spoke for the group again and the other plaintiffs again spoke in Spanish to DeLeon. (Doc. 38-8 (Dep. Wellington at 16); (Doc. 38-1 (Dep. DeLeon at 194, 197)). DeLeon recounted how Shaw threw job assignment cards, rushed the crew by saying "hurry up" and "chop chop," and how Shaw called him a "Mexican" on a number of occasions. (Doc. 38-1 (Dep. DeLeon at 194-196, 203-205)); Doc. 38-4 (Dep. Nunez at 165-166)). DeLeon stated that he believed Shaw's treatment was "racial;" DeLeon also testified that he stated that the treatment was because the crew was mostly Latino. (Doc. 38-1 (Dep. DeLeon at 202-204)).

According to Wellington, during this meeting DeLeon reported that Shaw treated the crew disrespectfully by looking over their shoulders while they worked, telling them to hurry up, snapping his fingers and laughing and staring at them while they worked and that Shaw was assigning them to do A&P work even though they were interiors mechanics and did not think they had to do the A&P work. (Doc. 38-8 (Dep. Wellington at 12-15, 28, 32); Doc. 38-12 (Decltn. Wellington at Ex. 5)). Bryant

Wellington at 12); Doc. 38-9 (Dep. Bryant at 44-47); Doc. 38-17 (Decltn. Glover at ¶26-28)).

15

testified that they complained that Shaw was "picking on them" because of the A&P work he was having them do – that the substance of the complaint was the type of job assignments that they were receiving. (Doc. 38-9 (Dep. Bryant at 60)).  Langley testified that it initially seemed to be more of a work complaint (having to perform the A&P work) but that they also started complaining about Shaw harassing them, pushing them "bird dogging them" with work; but that they did not report Shaw telling them to "chop, chop or Andale."  (Doc. 38-10 (Dep. Langley at 95-97, 101-102, 109-111)).

According to Plaintiffs, HR Manager Wellington said he did not know what he was going to do and told them to go back to work, "I'm going to see how I can solve this problem."  (Doc. 38-2 (Dep. Castillo at 159-160)).[11]  Castillo testified that Bryant told the group he would look into the problem personally and all three managers told them "we are going to take care of the problem" – "they were going to try to find a solution to the problem."  (Id. at 159-163).  After the meeting everyone shook hands, but to Castillo "it was very clear that they knew about it but they were hiding the problem."  (Id. at 164-165).  Additionally, DeLeon testified that Wellington told them "he was going to try to resolve the problem best he could, but . . . [he] goes, well, I don't know what I'm going to do about this[,]" and stated "there's not going to be no action taken against you guys….[w]e left on that note[;]" and Langley told them "this issue will get resolved."  (Doc. 38-1 (Dep. DeLeon at 196, 201-202)).  DeLeon did not recall if he was told they would investigate but remembered Wellington saying he "didn't know how he was going to fix this."  (Id. at 205).

Nunez testified that while he had difficulty understanding what was being said, Wellington said "okay let me . . . try to fix it[]" and that he "hear[d] . . . your problems" and would let them know by "the end of the day today, before you coming to work."  (Doc. 38-4 (Dep. Nunez II at 166, 173)).  _However_,

---

11  According to HR Manager Wellington, Bryant, Langley and Glover, Wellington and Bryant advised Plaintiffs that they would investigate and address the complaints and asked Plaintiffs and Glover to meet with Bryant, Langley and Shaw when they returned for the evening shift.  (Doc. 38-10 (Dep. Langley at 79-80, 94-97, 101-108); Doc. 38-9

Nunez also testified that Langley said "[i]f you [Wellington and Bryant] letting these people do – I told you before -- if you not fire these people, and then for the – and then the other people come in and do the same thing and then it's no good for the company. It's better you fire, is what I . . . heard before I left . . . ." (Id. at 178).

Ramirez testified that Wellington told them that the managers were "going to take care of that" and that the Program Manager Bryant added that he would "look into this personally." (Doc. 38-5 (Dep. Ramirez at 227-230)). Similarly, Loo testified that Wellington, Bryant and Langley stated that "they were going to investigate and that they were going to find a solution." (Doc. 38-6 (Dep. Loo at 180)). Loo testified that he heard an individual at the meeting say that they were going to meet together and were going to "arrive to a determination to see what they were planning to do[]" and that the meeting ended when Bryant told them "they were going to solve the problem." (Id. at 183, 185). Finally, Crespo testified that Wellington said he did not know what to do but would "look into the problem." (Doc. 38-24 (Dep. Crespo at 209)). Wellington also told them that the company would "do nothing against us because we went to human resources. That's what he not guaranteed but that's what he says." (Id. at 215).

Next, everyone shook hands (except for Crespo) and the plaintiffs and Glover left the meeting. (Doc. 38-2 (Dep. Castillo at 164-165); Doc. 38-4 (Dep. Nunez II at 189); Doc. 38-5 (Dep. Ramirez at 234); Doc. 38-6 (Dep. Loo at 186-187); Doc. 38-24 (Dep. Crespo at 214-215); Doc. 38-10 (Dep. Langley at 104-105); Doc. 38-8 (Dep. Wellington at 32-33); Doc. 38-9 (Dep. Bryant at 45)). After the meeting, Bryant and Langley planned to meet with Shaw to review the complaints and then to meet again with Shaw, Plaintiffs, Glover and Wellington when they all returned for the evening shift. (Doc. 38-8 (Dep. Wellington at 45-47); Doc. 38-10 (Dep. Langley at 79-80, 82-85, 107); Doc. 38-11 (Dep. Shaw at 51-

(Dep. Bryant at 44-45); Doc. 38-8 (Dep. Wellington at 31-33); Doc. 38-17 ((Decltn. Glover at ¶28)).

55); Doc. 38-12 (Decltn. Wellington at Ex. 5); Doc. 38-14 (Decltn. Shaw at ¶17).

After the meeting, Plaintiffs and Glover immediately went into the MAE parking lot to talk; they were dissatisfied with the results of the meeting. (Doc. 38-1 (Dep. DeLeon at 206-209); Doc. 38-2 (Dep. Castillo at 164-170, 218-219); Doc. 38-4 (Dep. Nunez II at 189-192); Doc. 38-5 (Dep. Ramirez at 234-238); Doc. 38-6 (Dep. Loo at 188-191); Doc. 38-17 (Decltn. Glover at ¶28); Doc. 38-24 (Dep. Crespo at 216-217)). Specifically, Loo testified that DeLeon stated to everyone that HR "is not doing anything for us" and so "we all pitch in our ideas" and then "it was like a synchronized agreement in our way of thinking, that nothing was going to be done." (Doc. 83-6 (Dep. Loo at 188-189)). "We all thought the same thing." (Id. at 190). And while talking things over in the parking lot, Glover told the group that he was not going to report to work and was going to call in "sick" (he did not tell plaintiffs that the real reason he would not be reporting for work was that he had a court-ordered anger management class to attend). (Doc. 38-17 (Decltn. Glover at ¶29)). Over the next 15 minutes, plaintiffs followed suit, with each calling security and advising that he would not be reporting to work because he was "sick."[12] (Doc. 38-12 (Decltn. Wellington at ¶10 and Ex. 5); Doc. 38-5 (Dep. Ramirez at 240); Doc. 38-6 (Dep. Loo at 191-192)).

Castillo testified that the plaintiffs made a collective decision not to report to work because:

[w]e arrived to the conclusion that we were not satisfied in the way that we were answered to our situation, particularly myself. I was not convinced and I was not really satisfied to go back to work.

* * *

We made a decision that we were not going back to work until they will find a solution for our problem, and as a group each of us made a phone call and we called according with the policy of the company to report that we were not feeling well…we thought everything was okay, and we were going to wait until the problem was resolved . . . .

* * *

And 30 minutes later, we were all fired when they [the coordinators] called us and [told us that] we were all fired.

---

12 Glover called in sick at 1:55 p.m., DeLeon at 1:56 p.m., Castillo at 2:00 p.m., Loo at 2:10 p.m., Crespo at 2:11 p.m., and Nunez at 2:15 p.m. (Doc. 38-12 (Decltn. Wellington at Ex. 5).

(Doc. 38-2 (Dep. Castillo at 169-170)). Castillo testified that he was not sick when he called-in and that Plaintiffs called security only to "justify that we were not coming to work according with their rules that we tried to follow [at MAE]." (Id. at 217-219). "We were not feeling well in the sense that we were not satisfied with the results of our meeting." (Id. at 219). DeLeon, Nunez and Ramirez testified that they all made a collective decision not to return to work. (Doc. 38-1 (Dep. DeLeon at 210); Doc. 38-4 (Dep. Nunez II at 195-196); Doc. 38-5 (Dep. Ramirez at 237-242). Nunez testified "I call in sick, is the only way I can protect you by yourself[]" and "[n]ot sick" but it is "the only way you can keep your work." (Doc. 38-4 (Dep. Nunez II at 195)). Nunez explained "[i]t's like for me. It's like – okay. If you want to do something, just call in sick and go do it and then come to work." (Id.)

Loo and Crespo testified that they were also dissatisfied with the meeting but that they each independently decided not to report to work and only learned afterwards that all plaintiffs and Glover had also done so. (Doc. 38-6 (Dep. Loo at 187-193); Doc. 38-24 (Dep. Crespo at 217-220)). Loo testified that he was not sick: "I was demoralized." (Doc. 38-6 (Dep. Loo at 193)). Crespo testified that he called in sick because "[h]ow can I go into work or how do I feel going to work to see John Shaw's face after I went to human resources, you know, and I accuse him to do all of this kind of things?" (Doc. 38-24 (Dep. Crespo at 218-219).

Instead of reporting to work, some of the Plaintiffs went to Hooters together to "drink a couple of beers and [eat] chicken wings[]" and then later some of the Plaintiffs visited the Diamond Gentlemen's Club together. (Doc. 38-4 (Dep. Nunez II at 196; Doc. 38-1 (Dep. DeLeon at 221-223)); Doc. 38-6 (Dep. Loo at 196); Doc. 38-17 (Decltn. Glover at ¶30)).

### G.  The Termination

Shaw's crew (Plaintiffs and Glover) were scheduled to work the evening shift starting at 3:30 p.m. on April 3, 2006. Langley called Shaw before his evening shift and asked him to come in early.

(Doc. 38-10 (Dep. Langley at 82-84)).  Shaw arrived at 2:30 p.m. and was met by Langley who escorted him to Bryant's office to discuss the Plaintiffs' complaints about Shaw "bird dogging" them.  (Id. at 84); (Doc. 38-11 (Dep. Shaw at 51)).  Shaw denied any harassment but agreed to meet with Plaintiffs and Glover when they arrived for their scheduled shift at 3:30 p.m., and offered to apologize if he had offended them in any way.  (Doc. 38-10 (Dep. Langley at 79-80, 84-85); Doc. 38-9 (Dep. Bryant at 43-45); Doc. 38-11 (Dep. Shaw at 49-55); Doc. 38-8 (Dep. Wellington at 45-46)).

Neither the Plaintiffs nor Glover reported to work for the shift beginning at 3:30 p.m.  When Shaw discovered this fact, he notified Langley who then contacted the guard service at MAE's main gate to determine if the crew had entered the facility.  (Doc. 38-8 (Dep. Wellington at 47-48); Doc. 38-12 (Decltn. Wellington at ¶10 and Ex. 5)).  He discovered that they had arrived at MAE around 1:00 p.m. (around the time of the prior meeting) but had left MAE before 3:30 p.m. and in between had called in over a period of 15-20 minutes reporting that they were "sick."  (Id.)  Langley reported this to Bryant who then met with HR Manager Wellington.  (Id.)  Wellington agreed that Plaintiffs and Glover were going to be terminated for the collective sick-out, which left Shaw with only one member of his crew to work on the aircraft that evening.  (Doc. 38-8 (Dep. Wellington at 49)).  According to Wellington:

> … [w]e were quite taken back by the fact they didn't come at all. And so then we saw they all called in sick, it was obviously a collective activity on the part of those gentlemen to do that, and all the calls came in with in five minutes of each other . . . it was almost like they were doing it as a group.  So. . . based on what we knew at that point, we felt the right action to take would be to terminate their employment because they were putting basically the program in jeopardy and . . . we're on a very short turnaround time with those aircraft and to have seven out of nine of your crew members not show up on any given night could jeopardize the delivery of that airplane. And so it was not something we could tolerate . . . .

(Id. at 49-50).  HR Wellington and Bryant made the termination decision, after consulting with and receiving approval from MAE President Joseph Ng.  (Id. at 52-55; Doc. 38-12 (Decltn. Wellington at ¶10)).

The next morning, April 4, 2006, Human Resources notified the contract coordinators for each of the Plaintiffs and Glover, to advise that each had been released for insubordination (the collective "sick out"). However, MAE told the coordinators that if any of the Plaintiffs or Glover could provide a doctor's note or some sort of justification as to why they were not at work, it would be considered.[13] (Doc. 38-12 (Delctn. Wellington at ¶10, 11); Doc. 38-8 (Dep. Wellington at 56-62); Doc. 38-9 (Dep. Bryant at 50-51)).

According to various Plaintiffs, their contract coordinators called them and gave them conflicting information; initially some of the plaintiffs were told they were laid-off and then later told that they were not terminated but were "on hold" and to report to MAE for a meeting with Wellington on April 4, 2006. (Doc. 38-1 (Dep. DeLeon at 223-233)). However, when some of them arrived at MAE shortly before the meeting time, their badges had been deactivated and Wellington was leaving the premises. (Id.; EEOC Complaints).

Shaw discovered at the end of the April 3, 2006 shift and then reported on the evening of April 4, 2006, that DeLeon had not been scheduled to work on April 3, 2006 even though he called in "sick" like the other Plaintiffs. MAE gave Deleon, through his coordinators, the opportunity to return to work, but he did not. (Doc. 38-1 (Dep. DeLeon at 241-243); Doc. 38-8 (Dep. Wellington at 51-52, 57, 62-63); Doc. 38-12 (Decltn. Wellington at ¶10-11); Doc. 38-9 (Dep. Bryant at 50-51)); Doc. 38-14 (Decltn. Shaw at ¶19); Doc. 38-11 (Dep. Shaw at 58-59)). Subsequently, MAE hired new workers for Shaw's crew: five Hispanics, one African-American and one Caucasian. (Doc. 38-12 (Decltn. Wellington at Ex. 5).

**H.    The Investigation**

After the Plaintiffs were terminated, HR Manager Wellington obtained written statements from Shaw, Langley and Davis (Shaw's relief Lead) regarding the plaintiffs' complaints. (Doc. 38-8 (Dep.

---

13 Plaintiffs appear to contend that the coordinators were not told about the ability of Plaintiffs to justify their

Wellington at 63-64)). Bryant and Wellington interviewed Caceres as well, the only other regular member of Shaw's crew. (Id.) All denied that Shaw had mistreated Plaintiffs in any way. Caceres told Wellington that the Plaintiffs frequently complained about A&P work because they did not want to do that kind of work and also complained when Shaw asked them to work harder; she reported that Shaw did not treat them with disrespect and that she had no problems with him (and in fact refused to accompany the crew to HR on April 3rd because she had no complaints). (Doc. 38-15 (Decltn. Caceres at ¶6-11, 13-14); Doc. 38-8 (Dep. Wellington at 64-66); Doc. 38-12 (Decltn. Wellington at ¶10 and Ex. 5)).

As previously stated, HR Manager Wellington advised the contract coordinators for the Plaintiffs and Glover that if any of them had a verifiable reason for failing to report for work (like a doctor's note for being sick), he would be allowed to return. Only Glover availed himself of this opportunity. (Doc. 38-18 (Decltn. Hardin at ¶5-9); Doc. 38-8 (Dep. Wellington at 56-61); Doc. 38-12 (Decltn. Wellington at ¶11); Doc. 38-1 (Dep. DeLeon at 240-244);[14] Doc. 38-2 (Dep. Castillo at 189); Doc. 38-4 (Dep. Nunez II at 210-212); Doc. 38-5 (Dep. Ramirez at 258); Doc. 38-24 (Dep. Crespo at 234-237); Doc. 38-6 (Dep. Loo at 213)). Specifically, on April 5, 2006, Daniel Hardin, the on-site contract coordinator for the contracting company that provided Glover and some of the Plaintiffs to MAE, contacted HR Manager Wellington and later met with him to explain that even though Glover walked off the job on April 3rd, he could not have worked that shift because he was required to attend a court-ordered counseling session. (Doc. 38-18 (Decltn. Hardin)). Hardin and Glover provided evidence to confirm this information and MAE independently confirmed same as well. HR Manager Wellington also talked to Glover who explained the reason he did not tell the truth when he called security to call in "sick" and he provided a

---

absence. However, the evidence cited by plaintiffs does not support this contention.

14 DeLeon testified that he told his coordinator that he was not scheduled to work on the day he was terminated. (Doc. 38-1 (Dep. DeLeon at 242-243)).

court order. (Doc. 38-9 (Dep. Bryant at 50-51)). Glover then requested the opportunity to return to

MAE and he was allowed to return as a contract worker (mechanic). (Doc. 38-17 (Decltn. Glover at 30,

32); Doc. 38-8 (Dep. Wellington at 68-71); Doc. 38-12 (Decltn. Wellington at ¶11); Doc. 38-9 (Dep.

Bryant at 45-46, 50-51)).

## II.     Discussion

## A.     Standard of Review

Summary judgment should be granted only if "there is no genuine issue as to any material fact

and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[15] The party

seeking summary judgment bears "the initial burden to show the district court, by reference to materials

on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats &

Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the

"initial responsibility of informing the district court of the basis for its motion, and identifying those

portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id.

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a

sufficient showing on an essential element of her case with respect to which she has the burden of proof,"

the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the

nonmoving party has met its burden, the court must stop short of weighing the evidence and making

credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen,

965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations

15   Rule 56(c)(2) of the Federal Rules of Civil Procedure, provides that summary judgment "should be rendered if
the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

omitted).  The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  <u>Lofton v. Sec'y of the Dep't of Children & Family Serv.</u>, 358 F.3d 804, 809 (11th Cir. 2004), <u>cert. den.</u>, 534 U.S. 1081 (2005).  Additionally, as noted by this Court in <u>Linn v. ST Mobile Aerospace Engineering, Inc.</u>, 2008 WL 2945558,*4 (S.D. Ala. Jul. 25, 2008): "The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See, e.g.*, *Wilson v. B/E Ae*rospace, Inc., 376 F.3d 1079 (11th Cir. 2004).  Rather, 'the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale.' *Id.* at 1086 (citation omitted)."

**B.     Application**

Plaintiffs assert national origin (Mexican, Cuban, Peruvian and Venezuelan) and race (Hispanic) harassment, retaliation and discrimination claims against MAE under Title VII and Section 1981.  In response, MAE asserts that Shaw's alleged harassment was unrelated to Plaintiffs' national origin or race and was not sufficiently severe or pervasive to create a hostile work environment.  Additionally, MAE asserts that it is not vicariously liable for any alleged harassment because they had an effective EEO policy to report discrimination which the Plaintiffs unreasonably failed to follow.  Moreover, MAE asserts that it terminated Plaintiffs' assignments for the legitimate non-retaliatory and non-discriminatory reason that they staged an unprecedented collective "sick out" on April 3, 2006 "notwithstanding unequivocal assurances that MAE would investigate and address their first and only complaint…." (Doc. 39 at 4).

Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the

---

to any material fact and that the movant is entitled to judgment as a matter of law."

full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). Claims of race discrimination under § 1981 are analyzed in the same manner as claims brought under Title VII. Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 n. 11 (11th Cir. 2000), cert. den., 534 U.S. 815 (2001) (citation omitted); Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

The McDonnell Douglas/Burdine (McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)) framework was established by the Supreme Court for evaluating a plaintiff's claims of discrimination against an employer where, as here, there is no direct evidence of discrimination. See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). The plaintiff must first make out a prima facie case of discrimination. Burdine, 450 U.S. at 252-253; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir. 1998); Combs, 106 F.3d at 1527-1528. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Burdine, 450 U.S. at 254. If the plaintiff establishes a prima facie case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action." Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Id. (quoting Burdine, 450 U.S. at 257). If the employer articulates a

legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the prima facie case is destroyed. <u>Walker</u>, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." <u>Combs</u>, 106 F.3d at 1528.

In applying the foregoing, the Court bears in mind that it is not the job of the undersigned "to act as a civility referee of ill-mannered behavior." Indeed, "[t]o the extent that plaintiff is contending that rudeness, alone, even extreme rudeness, can constitute a separate sub-category of a Section 1981 claim, this Court disagrees." <u>Benton v. Cousins Prop., Inc.</u>, 230 F. Supp. 2d 1351, 1376 (N.D. Ga. 2002). And as recently noted in <u>Reeves v. C.H. Robinson Worldwide, Inc</u>. 2010 WL 174074, *6 (11th Cir. Jan. 20, 2010) (emphasis added):

> . . . .where … indiscriminate vulgarity allegedly pervaded the workplace, we reaffirm the bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII . . . . general vulgarity or references to sex that are indiscriminate in nature will not, standing alone, generally be actionable. **Title VII is not a "general civility code."** <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 . . . . As we observed in <u>Baldwin v. Blue Cross/Blue Shield of Alabama</u>, "Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination . . . ."

1. **Hostile Work Environment & MAE's Liability**

A hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (citations omitted). Each individual plaintiff must show: 1) that he belongs to a protected group; 2) that he has been subject to unwelcome harassment; 3) that the harassment must have been based on a protected characteristic of the plaintiff; 4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and create a

discriminatorily abusive working environment; and 5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. See, e.g., Miller v. Kenworth of Dothan, Inc.,277 F.3d 1269, 1275 (11th Cir. 2002).   To be actionable, the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive." Harris, 510 U.S. at 21.  The plaintiff must also "subjectively perceive the environment to be abusive." Id.  Additionally, in assessing the objective severity of the harassment, courts consider (among other factors): 1) the frequency of the conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether the conduct unreasonably interferes with the employee's job performance.  Miller, 277 F.3d at 1276.

For purposes of this motion, the parties do not dispute that each Plaintiff is a member of a protected group, that each was subject to what he deemed to be unwelcome harassment and that some of Shaw's alleged conduct arguably was based on national origin or race.  However, MAE contends that Shaw's perceived mistreatment of Plaintiffs was unrelated to their nationality or race and that the purported harassment objectively was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a hostile working environment.

For purposes of this motion, the Court assumes that a reasonable jury could find that the claimed harassment occurred and that it was sufficiently severe and pervasive to alter the conditions of employment and create a discriminatorily abusive work environment.  Moreover, because Shaw was the immediate supervisor of the Plaintiffs, MAE is subject to vicarious liability.  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).

Plaintiffs have not made a viable argument that they were subject to any tangible employment

action.[16] Thus, "when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: '(a) that the employer exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Miller., 277 F.3d at 1278 (quoting Faragher, 524 U.S. at 807). See also e.g., Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1303 (11th Cir. 2007); Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1296 (11th Cir. 2000); Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1552 (11th Cir. 1997).

The record reveals that MAE implemented, disseminated and enforced its own EEO Policy as well as trained all leads, supervisors and managers (including Shaw, Langley and Bryant) on same. Each Plaintiff admits that he received, signed and read (except Nunez)[17] the EEO Policy. Plaintiff has not presented any evidence to contradict that prior to April 3, 2006, MAE exercised reasonable care to prevent national origin and race harassment in the workplace and to provide corrective opportunities if prohibited harassment occurred. Plaintiffs also do not dispute that after they complained, management immediately discussed with Shaw, upon his arrival at work that afternoon, Shaw's manner of rushing the Plaintiffs in their work and requested that Shaw apologize to the Plaintiffs (which Shaw agreed to do).

Rather, Plaintiffs point to what they consider to be an incomplete investigation after they were

---

16   "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation . . . . [a]s a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury." Id. at 761-7662. "Tangible employment actions fall within the special province of the supervisor. The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control . . . . [a] tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors . . . . . The supervisor often must obtain the imprimatur of the enterprise and use its internal processes." Id.

17   Nunez testified that while he received and signed the EEO Policy five times, he did not read the Policy.

fired and the fact that management did not specifically discuss with Shaw that the Plaintiffs believed

Shaw's treatment of the crew was based on their race/national origin.   The court finds the allegation of

incompleteness to be unsupported by the record.  Also, the record is clear that MAE promptly attempted

to address the harassment reported; as soon as Shaw arrived for his shift management met and discussed

the complaint with him.  The fact that MAE did not immediately share with Shaw that the Plaintiffs

perceived the harassment to be based on race/national origin does not show a lack of reasonable care on

MAE's part to address the alleged harassment promptly.

As to whether the Plaintiffs availed themselves of the preventive or corrective opportunities

provided by MAE, it is undisputed that they did not initially use MAE's complaint procedure under the

EEO Policy to report Shaw's harassment; they did not report any discrimination directly to the Manager

of Human Resources as provided by the EEO Policy until *April 3, 2006*.   After complaining about

Shaw's harassment to HR Manager Wellington on April 3, 2006, Plaintiffs were told that MAE would

investigate and address the complaints. However, before allowing a reasonable amount of time for same

(indeed, only 40 minutes passed), Plaintiffs decided to falsely call in sick because they did not think that

anything would be done about their complaints. A reasonable jury could not find Plaintiffs' action to be

justified. See, e.g., Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir. 2001) (noting

that "[a]n employee's subjective belief in the futility of reporting a harasser's behavior is not a reasonable

basis for failing to take advantage of any preventive or corrective opportunities provided by the

employer[]").  In sum, Plaintiffs unreasonably failed to take advantage of the preventive or corrective

opportunities provided by MAE because they did not even allow for those opportunities to run their

course, much less allow a reasonable amount of time for MAE to investigate and address their

complaints.   Accordingly, Plaintiffs have not established that MAE is vicariously liable on the hostile

work environment claim. Thus, MAE's motion as to Plaintiffs' Title VII/Section1981 hostile work environment claims is **GRANTED.**

### 2. **Retaliation and Discriminatory Termination**

a. Retaliation in Violation of Title VII and Section 1981

Title VII prohibits retaliation by an employer against an individual based on the individual's opposition to an unlawful employment practice or filing of a charge of discrimination. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation under Title VII or Section 1981, Plaintiffs must prove that: 1) they engaged in statutorily protected expression, 2) they suffered an adverse employment action, and 3) there is a causal relation between the two events. See, e.g., Saunders v. Emory Healthcare, Inc., Slip Copy, 2010 WL 65170, *4 (11th Cir. 2010) (unpublished); Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). "Statutorily protected expression includes complaining to superiors about harassment in the work place, lodging complaints with the EEOC and participating in discrimination-based lawsuits." Laosebikan v. Coca-Cola Co., 167 Fed. Appx. 758, 764 (11th Cir. 2006) (citing Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001)). See also Ross v. Baldwin Cty. Bd. of Educ., 2008 WL 820573, *5-6 and n.10 (S.D. Ala. Mar. 24, 2008); Grandquest v. Mobile Pulley & Machine Works, Inc., 163 F. Supp. 2d 1338, 1344 (S.D. Ala. 2001) (citing Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989)).

Once a plaintiff has established a prima face case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action as an affirmative defense to liability. Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1075, n. 54 (11th Cir. 1995); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). "If an employer articulates one or more legitimate reasons, the plaintiff, to avoid summary judgment, must produce

evidence sufficient to allow a reasonable fact finder to conclude that the employer's reasons were pretextual." Thompson v. Carrier Corp. Slip Copy, 2009 WL 4980425, *1 (11th Cir. Dec. 23, 2009) (unpublished). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." Chapman, 229 F.3d at 1030. A plaintiff's evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Vessels v. Atlanta Ind. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (per curiam) (quotation omitted). As noted in Thomas v. CVS/Pharmacy, 336 Fed. Appx. 913, 914 (11th Cir. 2009) (per curiam) (unpublished):

> To demonstrate pretext, the plaintiff may not simply "recast an employer's proffered nondiscriminatory reason[ ] or substitute his business judgment for that of the employer." Id. at 1030. Instead, he must "meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id. The plaintiff must be able to show both that the employer's proffered reason was false and that the true motive for the action was discriminatory. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). We do not act "as a super-personnel department that reexamines an entity's business decisions"; rather, we limit our inquiry to "whether the employer gave an honest explanation of its behavior." Id. (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir.1991)).

Turning to the requisite prima facie elements, Plaintiffs engaged in a statutorily protected expression (complaining the MAE HR Manger about Shaw's alleged harassment). Additionally, Plaintiffs suffered an adverse employment action because they were terminated. As such, whether Plaintiffs have established a prima facie case depends on whether they have established a causal relation between their complaint to HR and their termination. Plaintiffs contend that the causal connection is shown by the fact that they were fired only a few hours after complaining to human resources about Shaw's harassment.

The Eleventh Circuit has made clear that even if a plaintiff is terminated in close temporal proximity to a complaint of discrimination, a plaintiff's intervening act of misconduct severs the causal

31

connection between the employee's initial complaint of discrimination and the decision to terminate her employment. Hankins v. Air Tran Airways, 237 Fed. Appx. 513, 521 (11th Cir. 2007) (unpublished). "[C]lose temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity." Id. at 520.

The record establishes that Plaintiffs participated in what appeared to be a collective "sick out" on April 3, 2006. Specifically, the Plaintiffs and Glover complained to MAE's HR Manager about Shaw's harassment around 1:15 p.m., then the first of the Plaintiffs called in sick at 1:55 p.m. and thereafter each Plaintiff did likewise. Plaintiffs and Glover were all scheduled to report to work for the evening shift which began at 3:30 p.m., but no one reported for work. Inquiries were made and HR Wellington was notified of Plaintiffs' "sick out" and after meeting with Program Manager Bryant, decided to terminate Plaintiffs. (Doc. 38-12 (Decltn. Wellington at ¶10)). Wellington and Bryant subsequently met with MAE President Ng at 5:00 p.m., who then approved their decision. (Id.) The next morning, April 4th, Human Resources notified the contract coordinators for each of the plaintiffs and Glover, to advise that each had been released for insubordination (the collective "sick out").

The crew-wide "sick out" is an intervening event between the protected expression and the adverse employment action. Specifically, Plaintiffs' intervening act of misconduct – failing to report for work when scheduled – severed the causal connection between their initial complaint of harassment and MAE's decision to terminate their employment. See, e.g., Hankins, 237 Fed. Appx. at 521; Fleming v. Boeing Co., 120 F.3d 242, 248 (11th Cir. 1997); Whatley v. Metropolitan Atlanta Rapid Transit Auth., 632 F.2d 1325, 1329 (5th Cir. 1980).

However, even if the Court found that Plaintiffs established a prima facie case, Plaintiffs have failed to rebut the nondiscriminatory reason given by MAE, i.e., the collective "sick-out" for the Plaintiffs' termination. Plaintiffs do not dispute that a "sick out" is a legitimate non-retaliatory and non-

discriminatory reason for MAE to terminate them.  Rather, Plaintiffs contend that this reason is pretext for retaliation, pointing out that even though MAE claims that they were terminated because they did not report to work for the "sick out," MAE terminated DeLeon who was not even scheduled to work on the day of said "sick out" (April 3, 2006).  This fact does not support pretext because while not scheduled to work on April 3, 2006, DeLeon inexplicably called in "sick."[18]  Moreover, there is no evidence to dispute that HR Manager Wellington did not know that DeLeon had not been scheduled to work on April 3rd, until April 4, 2006, when Shaw told him.  A mistake in fact does not show pretext.  See Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000), cert. den., 532 U.S. 958 (2001) (providing that "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken, but that they were in fact motivated by [the protected characteristic]"); Alexander v. Fulton County, Ga., 207 F.3d 1303, 1339 (11th Cir. 2000)  (holding that "[a] plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race[]") overruled on other grounds, Manders v. Lee, 338 F.3d 1304 (11th Cir. 2003).

In an effort to show pretext, Plaintiffs also assert that MAE "kept changing its story as to the employment status of the Plaintiffs."  (Doc. 42 at 18).  Plaintiffs base this allegation on the fact that they received varying reports from their coordinators and were told by their coordinators that there would be a meeting on April 4th.  However, the evidence is undisputed that MAE communicated with the Plaintiffs concerning their employment status through the Plaintiffs' coordinators and that MAE instructed the coordinators that the Plaintiffs were terminated unless they could justify their absence.  Moreover, contract coordinator Hardin testified that he did not know anything about any April 4th meeting and "did not tell any of the seven contractors they were scheduled to meet with Dick Wellington on April 4th."

_____

[18] At that time, Wellington conferred with DeLeon's contract coordinator and advised that MAE was not sure why DeLeon would call in sick if he was scheduled to be off, "but we agreed….we would welcome him back to work."  (Doc. 38-8 (Dep. Wellington at 56-63, 71); Doc. 38-12 (Decltn. Wellington at ¶11); Doc. 38-14 (Decltn. Shaw at ¶19).  DeLeon

(Doc. 38-18 (Decltn. Hardin at ¶10)). In sum, Plaintiffs' evidence at best establishes that the coordinators, not MAE, may have given the Plaintiffs inconsistent information on their employment status.

The Court also notes (even though Plaintiffs do not appear to rely on this evidence) that Nunez testified that at the conclusion of the April 3, 2006 meeting with HR, he heard Langley state: "[i]f you letting these people do – I told you before -- if you not fire these people, and then for the – and then the other people come in and do the same thing and then it is no good for the company. It's better you fire, is what I . . . heard before I left." (Doc. 38-4 (Dep. Nunez II at 177-178)). This evidence could possibly be relied upon to show pretext except for the fact that Langley was not the decision maker and the evidence makes clear that he had no involvement in the decision making process (which involved only HR Manager Wellington, Program Manager Bryant and MAE President Ng) to terminate Plaintiffs after the sick out. (Doc. 38-8 (Dep. Wellington at 52-55); Doc. 38-12 (Decltn. Wellington at ¶10); Doc. 38-13 (Decltn. Langley at ¶11)). "Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee." Pennington, 261 F.3d at 1270. "This follows because such comments in isolation may reflect a personal prejudice or bias, but do not necessarily reflect company policy." Panchoosingh v. General Labor Staffing Services, Inc., Slip Copy, 2009 WL 961148, *6 (S.D. Fla. Apr. 8, 2009).

The bottom line is that Plaintiffs chose to express to management their displeasure of Shaw by calling in sick. MAE chose to exercise its legitimate right to not allow the disgruntled employees to dictate whether and when to work. In sum, Plaintiffs have failed to provide evidence from which a reasonable fact-finder could find that the reason given for termination is unworthy of credence. Accordingly, MAE's motion for summary judgment as to Plaintiffs' Title VII/Section 1981 retaliation

_____

testified that he made no effort to return to work. (Doc. 38-1 (Dep. DeLeon at 241-242)).

claims is **GRANTED**.

       b.       <u>Discriminatory Termination in Violation of Title VII and Section 1981</u>

Plaintiffs allege that they were terminated on the basis of their race and national origin (Hispanic (race) and Mexican, Cuban, Peruvian and Venezuelan (national origin)) in violation of Title VII and Section 1981. Both statutes have the same requirements of proof and use the same analytical framework and in order to establish a case under same, a plaintiff may use direct evidence, circumstantial evidence or statistical evidence of discriminatory intent. <u>See</u>, <u>e.g.</u>, <u>Standard v. A.B.E.L. Serv., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir. 1998). Title VII (and thus Section 1981) makes it is unlawful for an employer to discharge any individual because of that individual's race or national origin. <u>See</u> 42 U.S.C. § 2000e-2(a)(1). A plaintiff can establish a prima facie case of discrimination by showing that: 1) he is a member of a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) he was replaced by someone outside his protected class or "was treated less favorably than a similarly-situated individual outside his protected class." <u>See</u>, <u>e.g.</u>, <u>Maynard v. Bd. of Regents,</u> 342 F.3d 1281, 1289 (11th Cir. 2003).

It is undisputed that Plaintiffs satisfy the first three elements. As such, the dispositive issue is whether Plaintiffs were replaced by someone outside their protected class <u>or</u> whether a similarly situated employee outside their class was treated more favorably. Plaintiffs allege only the latter and thus, must show that a similarly situated employee outside their class was treated more favorably and that the "employees are similarly situated in all relevant respects." <u>Knight v. Baptist Hosp. of Miami, Inc</u>., 330 F.3d 1313, 1316 (11th Cir. 2003). "It is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." <u>Id</u>.

Concerning the fourth element of their prima facie case, Plaintiffs allege that they were terminated in discriminatory fashion because their non-Hispanic co-worker Glover (an African-

American) was allowed to return to work after the collective April 3, 2006 "sick-out," while they were not, even though MAE knew that Glover lied (just as they did) about being sick. The evidence shows both that Plaintiffs and Glover falsely called in "sick" on April 3, 2006 <u>and</u> were given the opportunity through their coordinators to return to work if they could provide a legitimate reason for their absence. While Plaintiffs did not avail themselves of this opportunity, Glover did. Specifically, Glover was allowed to return to work because he and his contract coordinator Hardin provided a valid reason for his absence and verification of same. Additionally, Glover contacted HR Manager Wellington at MAE and explained why he lied and called-in sick on April 3, 2006. Thus, while they all complained to HR and then falsely called in sick, only Glover provided an explanation for his absence. Glover was not treated more favorably than Plaintiff. He was simply given the same opportunity to explain his actions and did.

Because Plaintiffs have failed to point to a similarly-situated individual outside their protected class that was treated more favorably, they have not established a prima facie case of discrimination. Accordingly, Defendant's motion for summary judgment as to Plaintiffs' Title VII/Section 1981 discriminatory termination claims is **GRANTED.**

**III.**    <u>Conclusion</u>

Based upon the foregoing, the Court finds and it is hereby **ORDERED** that Defendant's Motion for Summary Judgment (Docs. 38, 39) is **GRANTED** in the manner set forth herein.

**DONE** and **ORDERED** this the **9**th day of **February 2010.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**